and the related cases. Mr. Rothfeld? Thank you, Mr. Chief Justice, and may it please the Court. The fundamental problem with the statutes at issue in these three cases is that they make it a criminal offense to assert a constitutional right. Under laws of North Dakota and Minnesota, a person who is stopped on suspicion of impaired driving is obligated to take a warrantless chemical test to determine the alcohol content of their blood. The states concede that these tests are searches in the meaning of the Fourth Amendment. The United States and North Dakota appear to recognize that no exception, none of the recognized exceptions to the warrant requirement, applies. Nevertheless, a person is obligated to take this warrantless, to submit to this warrantless search, and is committing a criminal offense if he or she does not do so. Is it correct to say that you concede that the state could revoke the test, either blood alcohol or breathalyzer? That is not at issue in this case. We haven't taken a position on that, but we don't dispute, for purposes of this case, that the state could do that. Well, let's assume that that is a concession, or that we hold that, or that that's a premise. If the state can impose a civil administrative sanction, why can it also impose a criminal sanction? And we could have hypotheticals where it would just be no more than three days in jail, criminal sanction, or a three-year suspension, which is obviously a great help. Why should there be a difference? I think the fundamental distinction that governs the outcome of this case, we think, is that between the state taking away a benefit that it didn't have to give you in the first place, which is what the Court addresses in the unconstitutional conditions line of cases, and this situation here in which the state is saying by fiat, you are subject to a criminal penalty, a affirmative criminal penalty, for asserting a constitutional right. In the case that you are hypothesizing about. Well, I think the conditions are just different. I don't think that analytically it's a different proposition. I have to disagree with that, Your Honor, for this reason. I think that in the unconstitutional conditions line of cases, what the Court has said is the state has given someone a benefit that it did not have to give in the first place, and all that the state is doing when it takes that benefit away is saying you are back in the position that you were to begin with. There is no direct penalty that's attached to what the individual is doing. And the Court in those cases has said we will look to see the practical effect of the combination of the benefit and the condition to see whether or not the state in reality is trying to do indirectly what it could not do directly, that being the suppression of a constitutional right. And so in those cases the Court will look to see what is the degree of the connection between the benefit and the condition. It will look to see the degree of coercion that the state's manipulation of the benefit and condition imposes on the individual to surrender a constitutional right. But as the Court has made very clear in this entire line of cases, what it's trying to do is figure out is the state trying to do indirectly something that it could not do directly, which is have a constitutional right. One way of looking at what the state is doing is not to criminalize the assertion of a benefit, but to criminalize reneging on a bargain. The bargain was we give you a license to drive, and in exchange for that you consent to a blood alcohol test under certain circumstances. And if you renege on that bargain, then that's what's criminalized. Why isn't that a better way of looking at this? I think to look at it that way, I think that you're sort of in the world of consent. In this case, at least, there is no suggestion that consent of that sort was present. But in this case, there is no reason to believe that the defendants had any idea that they were agreeing to the bargain that you described. Well, under Justice Alito, suppose for every driver's license you had to sign a consent form. I consent to take a breathalyzer test in the event that an officer has grounds to require it. Well, let me answer that question in two parts, Your Honor. First, as to what's going on in this case, where there is nothing like that on the form, you know, what's happening here, the way that these statutes operate, if you drive on the roads in North Dakota or Minnesota, you are automatically and irrevocably subject to the State's — Well, but I'm testing Justice Alito's question. Suppose there's real consent. Is that — Well, then the analysis would be, not the analysis in this case, but a consent form. I mean, if it's real, everybody has to sign this form that they don't — I'm assuming they're going to stop everybody at the border. So someone who isn't from that particular State, who hasn't signed anything, is still subject to the same criminal — Well, that's my next question. But let's talk about just the State. And, Justice Sotomayor, that, in fact, is the reality of this case. I know. But I think, as I say, the analysis there would be not the analysis in this case, but a consent analysis under the Schneck law line of cases. And I think there — it would be the State's obligation to show, on the totality of the circumstances, that the consent to permit the search and, therefore, to subject yourself to the conditions, is truly voluntary, that it's the product of the defendant's choice, that it was not the product of coercion. Especially in North Dakota, and as far as he's properly saying, you have to drive in order to — so we know that consent is fictional in that sense. But suppose that it was voluntary and that it was explained and so forth, and the driver signed. It still seems to me you'd have an argument that this is coerced. I think that's right. I think, as I say, that the analysis would be a consent analysis under Schneck law. And one of the key points of that is coercion. And I would think that if someone is told you cannot drive, particularly in a rural state like North Dakota, and probably anywhere, but certainly there, something which is absolutely essential to daily life, to calling to your job — So that would be grounded in what provision of the Constitution? That would be grounded in the Fourth Amendment, because the — No, the right people have to drive. I thought you were just postulating something, saying — I mean, you're saying the states could not take away that right. No, no, no. I apologize, Your Honor. That's not what I meant to say. What I'm saying is if the submission, as Justice Kennedy hypothesizes, is people are told and actually are aware that they are being told that if they drive, they are consenting to be searched, they're consenting to submit to the chemical test. I think whether the state can then execute on that depends on whether or not there is consent. Well, no, but I thought you said, well, of course there's coercion because you can't survive in North Dakota without a car, which I'm happy to postulate. But what is the basis for that right? I think that's not a right that's grounded in the Constitution. What's — the relevance of that is that there would be coercion, we think, within the meaning of voluntary consent. So for purposes of analyzing this case, we have to assume that states could prohibit people from driving, period? I think that that's right. Okay. Now, as far as the border goes, you don't want to understand stopping people at the border. But what if there's a sign at the border that says anyone who uses the state roads consents to, you know, blood alcohol testing if they're pulled over? Again, that would not be this case because in this case there is no suggestion that these defendants had any idea that these statutes existed, let alone that they were voluntarily surrendering their right to assert the Fourth Amendment. But in the hypothetical that you suggest, I think it would be a difficult case for the State to make because the State's obligation would have to be to carry the burden of showing that the defendant actually voluntarily surrendered the right to resist a — Is it true that the State could prohibit driving altogether without a reason? Well, I sort of conceded that to the Chief Justice. That's not an issue in our case. I'm not sure whether that is true. And if the State could not do that, then that makes our case even weaker because in that they could not then condition — they would not have a benefit that they could withdraw. I suppose the reason would be that the issue we're talking about, all the traffic deaths. Right? I mean, obviously it's not a realistic contention, but that's — a lot of the hypotheticals aren't. I'm trying to get to the basis of it seems to me that the flexibility that a State has in this situation depends upon what rights the motorist has. And I understand the Fourth Amendment argument, but it does seem to me that you're making an unconstitutional conditions argument. It is pertinent to determine what authority the State has in any event. That's right. But let me be very clear. I think that there are two points that are crucial. One is that we are not making an unconstitutional conditions argument. We are saying what the State is doing here is a direct assertion of — direct imposition of criminal penalties on people who assert their Fourth Amendment rights. This has nothing to do with a condition because, as I say, these defendants are not shown to have been aware that they were subject to a condition at all. But we're interested in other possibilities. And so if you assume that a State can condition the right to — the ability to drive on the State's roads — and let's assume this is not somebody who's crossing the border. Assume the State can condition the ability to drive on the State's roads on consenting to a blood alcohol test, perhaps under certain circumstances. Let's say this is done in writing at the time when the person applies for the license. So it's not just implied. Why does that — what is different about that situation from a number of other situations that I can think of? For example, conditioning a license to operate an interstate passenger train on submitting to a blood alcohol test in the event of reasonable suspicion, if the person is operating the train under the influence of alcohol, or the same thing with someone who is operating aircraft. Or suppose there were a law that said that if you want to enter certain government buildings, such as this building, the condition of entering is consenting to a search, and you have to go through the magnetometer. And then if a person got through that and there was reasonable suspicion that the person had smuggled in some kind of a weapon, the person would be subjected to a search. What would be the difference between that situation and this situation? I think there would be a number of distinctions. One would be I think that in at least some of the hypotheticals that you offer, the train hypothetical, for example, that's the Skinner case. There's a special needs exception to the warrant requirement applies. And so there is no ability on the part of the individual to resist the search. I mean, there is no warrantless — there's no requirement for a warrant in the first place. I think entering the government building would probably — In those cases, don't you just lose the benefit? You don't come into the building. That's correct. You lose your job. Well, again, let's be clear on sort of what the doctrine is. I think in the Skinner situation, I mean, there simply is no Fourth Amendment right. So we're not sort of in the benefits and conditions world. We're simply saying you have no right to resist the search. And I think that's true entering the building as well. I think otherwise — Well, but if you say that, and I recognize there's some circularity in both positions here, but you say, oh, well, in Skinner there was no constitutional right because we could take the constitutional right away, well, that's exactly what this government is going to argue. So it doesn't seem to me to help us. Again, I think I would look at it differently, Your Honor. I think that what's happening in a case like Skinner is the Court is addressing the substantive scope of the Fourth Amendment. I mean, it's saying that in the circumstances of this search, is there a requirement for a warrant? And as — Well, we would say, suppose we said this is like Skinner. If the Chief Justice asks about statistics, suppose there was a compelling showing that there was a measurable increase in traffic fatalities. If this was not enforced, we would say this is a special condition and, therefore, you must consent. And the bottom line is, and that means there's no constitutional right because we just said there's no constitutional right. Well, that, I think, Your Honor, would be creating a new exception to the Fourth Amendment. It's not a condition of analysis. But it's an important point. So I'd like to go back to this. I mean, I think what was happening in Skinner is the Court — and that's what we want in the circumstances, the individual's right to privacy, the — whether or not there is discretion on the part of the law enforcement officer to decide whether or not they execute the search. All those things go into special needs. And the Court said in these special needs situations, there is no Fourth Amendment — applying the ordinary Fourth Amendment principles, there is no Fourth Amendment entitlement. Maybe I misunderstood, but I thought that was the whole thrust of Justice Alito's question. Why can't we say this is special needs? Let's assume the statistics are compelling. We're talking about innocent lives, just as we were in Skinner. I think that the analysis there is, I mean, do we look to the basic Fourth Amendment characteristics that go into whether a search is required? In McNeely, I mean, the Court essentially addressed that very question. The Court addressed the argument that the nation's impaired driving problem is so severe, so compelling, that we can disregard the law requirement. And the Court rejected that. In fact, no member of the Court accepted that as a principle in McNeely. Well, I'm not sure that was the — I'm not sure that's different in this case. I mean, in the railroad case, I think what we're saying is that the need for safe transportation on the trains to protect the innocent people there is compelling enough that it falls within the special needs exception. And, again, I'm not sure why that analysis wouldn't apply here. I don't know. I suspect more people die from drunk driving accidents than from train accidents. And so the special needs would seem to be just as compelling. But I think that that was not the rationale in Skinner, certainly not the entire rationale. I think that the principle reason for saying there was no law requirement there — and the Court said not just that there was no law requirement, but that there was no probable cause requirement, that there could be a search without suspicion at all. No one is suggesting that that's appropriate here. I think that the reason the Court came to that conclusion, both in Skinner and Von Raab and Bernonia and that entire line of cases, is kind of the whole combination of characteristics, that there was no discretion, as I said, on the part of a law enforcement officer to decide who to search, that there were, you know, a variety of things that had sort of nothing to do with the ordinary criminal process. These were not criminal investigations at all. And the Court has said time and again that in an ordinary law enforcement circumstance where a search is being conducted, that a warrant is required. That is the presumption, unless — It's a presumption, but there are many ways of analyzing this case. So let me try to get you to focus on one that doesn't have to do with consent or any of these differences that you've — many of them that you've been discussing. One way to analyze it is you just ask, is it — is this, it seems, an exception to the Fourth Amendment? The question is whether the Fourth Amendment requires a warrant in these circumstances. And it seems to me if it does, then you win. And if it doesn't, then the State has considerable freedom. It couldn't boil people in oil, but it might be able to do this. All right. So that's what I'm thinking. Now, the question is — and I don't find this very much in the briefs, and it surprises me. That's what I want you to address. Why isn't there a big difference between a blood test and a breathalyzer? I mean, look, I look at a breathalyzer, it's a little box the size of a cell phone. It has a little straw on the end, and you breathe into it. And what you breathe into it is carbon dioxide, which is going to go into the environment anyway. You're not going to keep it. And moreover, it takes place quickly, so the evidence hasn't disappeared. A blood test, you have to go somewhere else. There is risk involved. Time elapses, so you lose some of the evidence. And it's painful in some instances. So I immediately think, isn't there a difference? So encapsulated in what I'm saying is, what is wrong with a breathalyzer test when it can save lots of lives and is given to those people where there is probable cause, I take it, or at least reasonable position to think they're drunk? It'll cure the innocent? It'll inculpate the guilty? Very little interference. But a blood test? I mean, that might be a different thing. OK, I'd appreciate what your response is to that line of thought. And I will do that. I'll just say to begin with, I think that your preparatory statement is quite correct, that if a warrant is required here, we win. If a warrant is not required, then the state has considerably more leeway in what it can do. On the breath test, breath test is a significant intrusion on personal integrity, as the court said in Skinner. First of all, there is no question that the breath test is a search in the Fourth Amendment, meaning the Fourth Amendment. That's conceded by my friends on the other side. And the Court's presumption has been that when there is a search in a law enforcement proceeding, a warrant is going to be required unless one of the regular exceptions to the warrant requirement applies. I think it is conceded by the United States and North Dakota that there is no such exception here. And so why can't we say that with respect to a breath test, that this is a search incident to arrest? I think that it's not a search incident to arrest for the reasons that were stated by dissenting opinion in the Bernard case by Justices Strauss and Page in the Minnesota Supreme Court, which is, this Court has made very, very clear consistently from Chimel on through Riley most recently, that search incident to arrest turns on the existence of one of two considerations. Either the search is necessary to preserve officer safety or to preserve evidence. Well, I think that this would be based on the notion that it's necessary to preserve evidence, plus the notion, which Justice Breyer suggested, that this is about as uninvasive as a search can possibly be. And so that given those two things together, that it is useful to preserve evidence and that it is an extremely uninvasive search, that we can assimilate it into the search incident to arrest doctrine. Well, let me answer both of those points. On the preservation of evidence, the evidence that's being tested here is the blood alcohol level, so the alcohol level in the blood. And you're simply using breath as a means of doing that. As to that, breath and blood are identical. And so as the Court addressed this in McNeely and — Yes, but there's something very different in the level of invasion. And certainly it's appropriate to look at the invasiveness of a search when deciding whether to do a search incident to arrest. I mean, if that weren't true, we wouldn't have talked about how much you could get off of a cell phone in Riley. If that weren't true, we would allow people to do body cavity searches when they do search incidents to arrest. So it seems to me that the Court can look at the level of invasion, incidents to a search, when deciding whether a particular search comes within the search incidents to arrest doctrine, and that that might be a way of separating out this category of cases from the ones that we were talking about in McNeely. Well, let me say two things about that. First, our sense is that a breath test is, in fact, a significant intrusion on personal integrity for the reasons the Court suggested in the Skinner case. When one takes one of these breathalyzer tests, I mean, it is not, Justice Breyer, that you're exhaling in the ordinary way, and the carbon dioxide is dissipated. I didn't say ordinary way. I said you blow hard into a little straw-like thing that's connected with what looks like a cell phone. So using the word significant or not doesn't help me. I mean, it is what it is. And the question is why it is so intrusive that the Constitution insists on a warrant where that insistence could undermine, in many cases, the evidence that you are looking for. Now, that's a question of several factors. And it just doesn't help me to say significant or not significant. That seems to me the question, not the answer. Well, as to why we think it is significant as a personal matter, when one takes a breathalyzer test of this kind, a tube is inserted into the person's mouth. You have to exhale continuously for an extensive period of time. It could be as many as 20 or 25 seconds. And the point of it is to expel what the Court has characterized in Skinner as deep, long air. What does that have to do with it? I mean, after all, if, in fact, the person's eyes turned bloodshot, when every time he had a couple of bottles of whiskey, you could look at his eyes. And that wouldn't be intrusive at all. I mean, what you're looking for doesn't have much to do with the intrusion. It's the way you're looking for it that's the problem. That's the problem. Not that you happen to want to know it for a particular reason. You're inserting a tube into a person's mouth to get them to expel something from deep within their body so that it can be tested by the government. Excuse me. I know we've assumed that it's only evidentiary. But in my experience, police, when they do the road test, do it because they want to confirm that you're, in fact, drunk. Before they take you in and take you off the road, they're doing this test as part of the probable cause evaluation. Is there enough probable cause to bring you in? There may be, independent of it, but sometimes the breath test exonerates people and they go on their merry way. So why are we thinking that it is only evidentiary? I do think the blood test is, by the way. Once you've arrested someone, you've decided to take them off the road, and the road is now safe from that person. And that is true of the breath test. We're talking here not about preliminary field sobriety screens. We're talking about people who have been arrested or as to whom there is probable cause to believe that they have been driving while on top. As I said, there's probable cause and there's probable cause. But I'm meaning, why can't we view it as just part of the necessity of the stop and suspicion of the stop? Because I think, again, that the tests we're talking about here, under the laws of both North Dakota and Minnesota, the officer has the right to give... Right, but what is the percent of tests of breathalyzers that is given by the car, and what percent of breathalyzers is given after the person has been arrested and moved to jail, or are the equivalent? Well, there are, as I said, the field sobriety tests, and I think that's given in practically every case as an initial screen. I'm saying what percent is which, okay? I'm asking because I'm curious and think that might be relevant, and you may not know. So if you don't know, say you don't know. I don't know, Your Honor. I think that the answer to that question, how many people who are stopped in a preliminary way are then arrested for suspicion of driving while impaired? And I'm not sure that there are statistics that anyone has that are available. Suppose the breathalyzer test was improved. There's better technology. So let's suppose that all that's required is to put the breathalyzer a couple of inches, an inch from the person's mouth and wait for the person to breathe, and that would be sufficient to measure blood alcohol. Would you say that's a search? I think that might not be a search. I think that would be a very different situation. All right, so if you compare that with what has to be done here, what is the big difference between those? Did you have to put a straw in your mouth? Well, I would think, Your Honor, that most people, and maybe this is just me, but my suspicion would be that if presented with the possibility of either inserting something into your mouth and expelling something from deep within your body to be tested by the government, people would find that more intrusive than having an officer look in their backpack. It doesn't seem realistic. The reason why people don't want to submit to a blood alcohol test is that they don't want their blood alcohol measured. It's not that they object so much to blowing into a straw. Do you disagree with that? Well, I think maybe I do, Your Honor. Obviously, people who are stopped on the road don't want to be tested in any respect. There's no question about that. Well, that's not true. If you're not drunk, you'd be happy to be tested, right? Well, I think that's an intrusion, too. Maybe that ultimately you would be happy to be tested and let on your way. Well, that's an intrusion when you pat down someone having probable cause to believe he's committing a crime, and you pat him down. Which is the worst intrusion? I would guess pat down is a much more intrusive form of search than saying would you blow into a straw. But we allow it. Let me, again, sort of offer two points on that. One is the States, in their treatment of blood and breath tests, as the Court described in McNeely, almost uniformly treat the breath tests and the blood tests identically. And as the Court suggested in McNeely. That's really my unknown question. Why? Why? Because that's why I started with that, because I really don't know the answer. And I think the answer, Your Honor, is that people understand the breath test to be — it's designed to obtain the same evidence, literally exactly the same evidence as the blood test and why, in response to Justice Kagan's question — But that — I guess — please, go ahead. But I think that you're concerned about the dissipation of this evidence. I think as to the blood and the breath test, it's exactly the same. Yes, you're right that it's designed to get at the same evidence, and you're right that the dissipation of the evidence works in exactly the same way. But you're suggesting that we should close our eyes to the fact that there's a very significant difference in the degree of invasiveness. You know, even assuming that both of these are searches, which I have to say, you know, I think that that's — we've held that, and so glowing is a search. There's no question about that. But there are searches, and then again, there are searches. There are more invasive searches and less invasive searches. And I guess my intuitions are that that's an important difference when we think about these questions. Well, as to the nature of the breath test — and again, I've been addressing this, and I'm not sure how much more there is to say about it. But I think that the reality is when a foreign object is inserted into a person's body and they are asked to expel something from deep within their body to be tested by the government, that, sir, on the face of it, is an intrusive proposition, something that most people would regard as, as the Court suggested in Skinner, a significant invasion of their personal integrity. What about the standard sobriety test? I take it you're not challenging. Police officers said, walk a straight line. That's right. I think that would not — certainly would not be a search. And I doubt it would be a seizure. So I think that that's right. Even though it's involuntary. The person doesn't want to do it. If it's not a search, we're not concerned with Fourth Amendment limitations. So it may be a seizure. And that's something we have not analyzed or thought about. And certainly I'm not challenging it. But it is a seizure if you say to a person, now, you walk a straight line, and that person is in the control of the police officer at the time. Now, I think these are almost all voluntary. If the officer asks, would you walk a straight line, people do it or attempt to do it. So if that's the case, certainly there can be no Fourth Amendment problem. But those are not — as I said, they're not challenged here. I think they present a different — entirely different set of issues. I guess — Go ahead. Just to return to Justice Kagan's point, I think in addition to the particular characteristics of the breath test, which we do think are personally intrusive, I think it is a fact that the Court has always, whenever it has confronted a search — and there is no question that these are searches — in an ordinary law enforcement investigation, not in a special needs kind of sort of general investigation, the Court has said there must be a warrant unless one of the recognized exceptions apply. And the recognized exceptions, I think, that are substantially conceded by the other side do not apply here. And so it would be, I think, a novelty — Well, but I guess that the question I ask — I agree with you that you do need a recognized exception and that we should not feel good about making up new exceptions willy-nilly. The question is, why isn't this a search incident to arrest, given the various aspects that I've mentioned? The fact that the evidence does dissipate over time, that getting a warrant might interfere with that, and that it's relatively uninvasive. Right. If I'm to answer that question, Your Honor, I'd better sit down. I think for dissipation, for search incident to arrest purposes, my understanding of that doctrine is one is concerned with the suspect doing something affirmatively to get rid of the evidence, flushing the evidence down the corridor. That is the classic search incident to arrest situation. The Court in McNeely made very clear that we're not dealing with that here. The alcohol, breath test, blood test, doesn't matter. It's going to dissipate at a predictable level. It's going to remain in the body to be tested later on. And so I don't think that justifies a search — shoehorning this in to the search incident to arrest doctrine. It's simply degraded from an entirely different category of threats to evidence, as I understand it. Why isn't it an affirmative effort to get rid of the evidence? Because you know the longer the interval passes, the less likely that the test is going to reveal a level that's over the standard amount. Well, but I think, Your Honor, for the evidence suggested in McNeely, which shows that there's nothing you can do — nothing affirmative you can do to take this evidence and hide it. It's going to be dissipated in a predictable way, and it's not in your control to do it. And if the State can test you quickly, and a breath test can be very quick, the State will be able to obtain the evidence. If the State gets a warrant, they can do that, and that's what they should do. Thank you, Counsel. Mr. McCarthy? Mr. Chief Justice, and may it please the Court. The North Dakota statute strikes a bargain with individuals who wish to use the State's public roads, conditioning their use thereon on consent to a blood alcohol test if arrested for drunk driving. The Court has held that this is a valid bargain, and that States may enforce it with the imposition of significant consequences, including license revocation and the use of test refusal as evidence in criminal proceedings. What about another bargain if people find that texting while driving is becoming an increasing problem? And so when you get a license, you give implied consent for the officer to look at the text or whatever they can look at on your cell phone to make sure, you know, a minute ago you were texting somebody while driving. Would that be acceptable under your rationale? I think it's highly doubtful, Your Honor. I think there's many differences between that and what's going on here. First of all, the interest here is a uniquely compelling interest. Well, I assume. I don't know what the statistics are going to say. It wouldn't surprise me if there are at least as many accidents caused by people texting while driving as drinking while driving. Even still, Your Honor, I think this statute, given the history here, it's a uniquely compelling interest. But on top of that... What do you mean, the history? The history of the state's battle in combating drunk driving. Well, there's not that much history for texting because there haven't been iPhones around. Certainly, Your Honor. Nonetheless, there's, in these cases, there's first, the search only comes up when the driver has been arrested. So there's probable cause to believe that this person was driving drunk. So this law is targeted very tightly right there on the people that are causing the problem. I don't see that that's a difference with respect to my hypothetical. People swerve in the road because they're texting, just like they do when they're intoxicated and they're stopped for doing that. And the officer says, let me see your phone. As opposed to just like, let me see your breath. Let me test your breath. Let me check the phone. Again, Your Honor, I think it is different because there is probable cause. The officer has reason to believe that the person has been drinking and driving as opposed to... Where does that probable cause come from? It comes from the field sobriety test. It comes from doing, typically... He's got to do those before the breathalyzer? Not necessarily. I suppose an officer could do a preliminary on-site screening test, breath test, before the sobriety test. But typically what happens is that was probable cause. The car has been weaving. The alcohol is smelly. His speech is slurred. His eyes are red. Yes, this is... This is standard stuff. Yes, this is all standard. And so it's like the chief judge is a hypothetical. Weaving on the road while you're texting. Well, even aside from that, there's a whole separate set of... The intrusion is much different, as the court indicated most recently in the cell phone case. That's separate. It's one level over. And that's much more intrusive to go into that. And there's not the same interest with the dissipation of the evidence that there is in the case of the drunk driver. Not only that, but what's happening here is the states are really in a terrible bind. The situation here, if states are left only with administrative penalties for refusal, then what happens is it creates a loophole in the system that makes it very, very difficult to... You can get a warrant. I mean, you're not left with that. You don't want the administrative expense of calling a magistrate or setting up a system to get a warrant, but it is a very powerful alternative. That's what we said in McNeely. So it's not that you don't have an out. The issue for us is do we dispense with a very important requirement in our law that before you search particularly the inside of a person with a needle or in an intrusive way that you get a warrant? I'm not sure why you think you're left with nothing. Well, Your Honor, two things. One, we think McNeely is helpful for us because what the court was concerned about there was forced blood draws over the objection of the U.S.D. And those don't happen under this system. And that's the second part of McNeely is that McNeely pointed to these types of statutes and said these are alternatives that don't require forced blood draws, that avoid the problems. We've already talked about civil consequences, suspend the license. That's directly related to the condition that the license is given. But criminal sanctions are a very different thing in scope and in effect. You're putting someone in jail. You're not taking just their license away. Criminal penalties are different. We don't dispute that. And that is really just the essence of the question on the table here, given that the court has already endorsed these types of conditions being imposed on the privilege of driving and has endorsed significant consequences being used as an enforcement mechanism. Could you say something about what the practical consequences of requiring a warrant for every breathalyzer would be in a state like North Dakota? My picture of North Dakota is that it's not like New York City. You don't have night court going on all the time. And so how many of these tests occur during some period of time, and how many magistrates would you have on duty, let's say at 2 o'clock in the morning, to field a request for a warrant? Well, the first part of my answer is that if a warrant was required in every case, that would go well beyond what the Fourth Amendment requires, because even in McNeely, the court acknowledged that in many cases, a warrant won't be required. But in North Dakota, Your Honor brings up an interesting point. It's not that there are judges or magistrates on duty all the time in North Dakota. In fact, they're considered what is known there as on-call, so they're not on duty, but they may be reachable somewhere, typically by phone. But it often takes a while, especially in rural jurisdictions. How long? What it says in the ACDL brief is that in Wyoming it takes 5 minutes, and in Montana it takes 15 minutes. How long does it take in North Dakota? In North Dakota, in the larger jurisdictions, where there's a little bit of a quicker process where they use more telephonic warrants and the arresting officer can go directly to a magistrate in those systems, my understanding is it typically takes about a half an hour to an hour. But in the smaller jurisdictions where it's more rural, where it's oftentimes harder to get somebody on the phone, and there the process is different. The officer has to go through a prosecuting attorney first and then to a magistrate. When is it harder to get somebody on the phone in rural than in a busy city? I think a large part of the people in the rural areas were sitting waiting for the phone to go. Your Honor, I think in large part it's a lack of resources and manpower. There's not as many people available to cover all the times. So that excuses you from a constitutional requirement? Your Honor, we're now going to bend the Fourth Amendment, which I always thought started on the presumption that we favor warrants. We don't disfavor them. But since many jurisdictions seem to manage it, we give a pass to North Dakota because it doesn't want to? It's not that North Dakota is asking for a pass here. There's a couple things here. One, again, is that a warrant is not required in every case. The second thing is that the warrant... I think what people are asking you is to try to get some sense of the real-world harms here. So let me just ask you to assume something. Assume that you actually could put into practice a system which got you a warrant in 10 or 15 minutes, which many states of a similar kind have done. What then would be your interest in the rule that you are asking us for? The interest would be almost the same, really. And this is the important part here. The purpose of the warrant is to authorize a search over the objection of the arrestee. But that's not happening here. The state does not want to undertake those searches because it's a public safety risk, not only to the officer and to the arrestee, but the medical personnel would be in between them. And this is something the court acknowledged. If you obstruct justice by refusing to comply with the warrant, you can punish someone for obstructing justice, and you can get the same outcome as putting them in jail for being drunk and driving. So what is it that justifies doing away with something as important as the Fourth Amendment warrant requirement? Again... If you can do it in 15 minutes. Again, it's not that the state is trying to get rid of the warrant requirement. I think it's helpful if we... No, what it's trying to do is get evidence of someone. This is a pure law enforcement need. This has nothing to do necessarily with the safety of the community because the person has been taken off the road. And we presume that you can suspend their license. So this is something more. Your Honor... I'm sorry. Your Honor, this is different. This is something more. But it's not about doing away with the warrant requirement. And I respectfully disagree that the suspension of the license and the arrest of the person takes them off the road and makes it not a public safety interest. It's still very much a public safety interest. And it requires some explanation here. But the problem here is that the states really cannot effectively, and North Dakota in particular cannot effectively enforce its drunk driving laws without a penalty for refusal that actually has teeth. That's what we're asking. Because if you could get a warrant easily in every case, then I'm struggling to figure out what your interest is in having the kind of law that you have. But maybe I'm just not understanding something. So it really is a question. Suppose you could set up a system where somebody could be reached within 10 or 15 minutes and they would, in almost all circumstances, give a warrant, and then a couple say, no, I don't think you've satisfied the requirements. And you could do that in 10 or 15 minutes. What would be the problem with just relying on a system like that? Again, there's two problems. One is that the warrant's not required in every case, and so this would go beyond the Fourth Amendment. I'm asking about your practical needs, and then we'll figure out what is or what isn't consistent with the Fourth Amendment. But your practical needs. Again, the other point here is that the point of the warrant is to authorize the search over the objection. The state doesn't want to do that. To step back, I cannot understand that answer. We're struggling for, in the wake of our recent cases where we talk about warrants, we find out that modern technology allows in some states, both sparsely populated and heavily populated, to get a warrant in 15 minutes. And the position the states are arguing here is that a warrant is not necessary. It takes too long. We're saying, suppose it takes 15 minutes. What then? You're asking for an extraordinary exception here. You're asking for us to make a decline, to exercise what many people think of as a constitutional right. There's some circularity there. And you can point to no case which allows that. So we have to show there's an exception, that there's a necessity for the exception. And you're just not answering the question about whether or not, in the wake of our recent decisions over the last three or four years, warrants have been expedited in many cases, and if they have been, why that isn't an answer to your argument. Well, there's a couple reasons. One is, to require a warrant in this situation, I think would actually require the court to, it would essentially invalidate the statutes that the court upheld in Mackey and Neville. There was no warrant required in those cases. We're talking law. None of us want an answer in terms of law. We want to know a practical fact. The practical fact is, is it possible that you could get a warrant in 30 seconds? You have a button on the cell phone. It has a big W. The policeman presses it. A voice comes on, and it says, what's the problem? You explain it in 15 seconds. And they say, I got it. Okay, you got your warrant, or there's something unusual. And he says, no. Okay. Now, if that were in front of us, it wouldn't take me too long to decide this case. Because I'd say, why don't you use it? And you might answer, that's ridiculous. It isn't 30 seconds. It can't be. It isn't five minutes. It isn't 15, even, in most parts. And it can't be without added expense. Or you could say, it doesn't make any difference, and explain it. I think you have a hard time with that one. But I want to know what your answer is on the facts. On the facts, there is delay, some delay in getting a warrant. And that does make a difference here. Why does it make enough of a difference? Well, there's a couple reasons. But I want to step back here, because the implication of a Fourth Amendment right is the start of the analysis. It's not the end of the analysis. Because we're in the unconstitutional conditions context, where there's a bargain here. And the court has always allowed states to impose conditions on the use of the public roads in this manner. For nearly 100 years, the court has allowed this type of thing as a mechanism to impose conditions. So it's really just the criminal element that makes a difference. You're not answering the question. Do you know how many breathalyzer tests or blood tests are administered during any period of time in North Dakota? There's approximately 6,000 of the two, and there's roughly 50-50 over the course of about a year. 6,000? Yes. Okay. Could I ask you a different kind of just factual question? How many of these are done roadside? How many are taken to a police station? When are people taken to a police station? What is the practice? Sorry, I see you have a question. Please answer. So the only test that's done on site is the primary test, which is not admissible in court. The blood tests are done at a medical facility, either by a doctor or a nurse. The breath tests are done usually at a police station or a jail or someplace where they have the chemical breath test. Thank you. Thank you, counsel. Ms. Keenan? Thank you, Mr. Chief Justice, and may it please the Court. I'd like to follow up on some of the questions of the practicality of search warrants in these situations. And having grown up 20 miles from the North Dakota border and attending college in the Fargo-Moorhead area, I'm very familiar with what the realities are in the rural area. And, yes, it may be possible to get a search warrant in every case. But if that's what this Court is going to require, in Minnesota we are going to be doing warrants and blood draws in every case. And that is not what this Court wants. Why? Because why would I now, as a police officer, cause any more delay? Because there is going to be a delay getting that search warrant. And why would I delay by taking someone to the police department? Because that's where most of these tests are being conducted in Minnesota and North Dakota. They're not done on the side of the road. Blood and breath? Breath, yes. Breath. Blood, you have to go to the hospital. I see the breath part is the part that sort of now gets here. If you're taking them to the police station anyway to do the breath test, and it just requires a phone call to get the warrant, what's the problem? But why bother? Because now I've transported this person to the police station. I then have to get a warrant and now take them. Phone on the way. Phone on the way. So let's talk about the rural aspects of Minnesota and North Dakota. In a lot of these jurisdictions, there's only one officer on duty. I grew up in a town 2,020 miles from the North Dakota border. There was only ever one officer on duty, and that hasn't changed. The other problem is there's not a hospital located in every jurisdiction in Minnesota and North Dakota. And, for example, in the town that I grew up in, the nearest hospital would actually be in Fargo, North Dakota. So now where do I go? But you do the breath test then. You don't take them to the blood test. That's the practical alternative. You have two tests, breath test, blood test. You can choose precinct or hospital if they choose to take the breath test. Now, I'm not going to get a warrant to take a breath test because I can't force somebody to blow into the straw. Well, you're going to get a crime not to. That'll force them. Okay, so I know we're somehow missing in this argument. I think what people are trying to figure out, at least me, is if, first, forget the blood test. The blood test is a separate matter in my mind. I'm thinking solely about the breath test. Does the Constitution require you to get a warrant before you administer the breath test? Other things being equal, the Constitution leans in that direction. And so I ask you, why not? And now you've told me all the things that cut against you. You say, well, before we give the breath test, we take them to the station. And so then that seems to take 15 minutes. And in the meantime, why can't you just call the magistrate and at least we have some kind of safeguard against total arbitrary behavior? That's where you are. And so why is that bad for the state? And I have to look at our implied consent statute and what that allows and doesn't allow. And so currently Minnesota's implied consent statute says, once I offer a test and they refuse, we're done. We're done. I don't know how to explain it more clearly. No, I'm not talking law. I'm talking practical facts. If you're prepared to come back and say to me, you know, if we have to get a warrant, 50% of the drunk drivers are never going to be caught. I'll listen to that. If you come back to me and say, you know, if you say that a warrant is required, it will mean that 400 policemen have to spend 10 seconds more than they'd otherwise spend on a telephone. I say, well, that's a point, but not that much of a point. Now, do you see? I'm trying to get a fact. And I don't have those type of statistics to answer that. Maybe a different way of asking a similar kind of question. When we decided McNally, there were two opinions, but even the opinion that was the concurrence or I don't remember whether it was a concurrence or a dissent, but the one that was the Chief Justice's opinion, even that said, and this was with respect to a blood test, but the Chief Justice's opinion said, look, if there's 20 minutes between the time that you're stopped and the time that we can get you to a hospital to get a blood draw, and you can get a warrant in that 20 minutes, then yes, you have to go get a warrant in that 20 minutes. So at the very least, why wouldn't that be the case? You know, if all of these things, I mean, I have to say when I originally thought about this case, I had in my mind roadside stops. But in all of these cases, you're actually driving these people to a station house. So why can't you get at least what the Chief Justice said in McNally, which is, okay, if you can get a warrant within that time, you have to get a warrant within that time. And, you know, I'm speaking on behalf of Minnesota, and it's very clear. Minnesota treats, and I don't necessarily disagree with you, but Minnesota's up here is kind of the alternative argument. Minnesota specifically treats blood tests differently than breath tests. We specifically do. And our court has recognized that. So, for example, under the implied consent law in Minnesota, if you are, in order to get a blood or urine test, you have to offer both. And so we do treat it differently. And the case in Minnesota treated it differently in the Bernard case. It's very clear. And they very clearly stated that in ruling that they weren't going to address blood or urine, and they will be shortly because there are two cases before them where that issue. That's good. Let's talk just about the breath tests. Number one, I'm not sure why they're not roadside. But number two, if you take them to the precinct station, then you have our question about the warrant. Let's talk just about the breath test and the practicalities of adopting the petitioner's position. Let's assume, I know my colleagues are, as part of this, okay, assume, as Justice Kagan did, that a system could be put in place for a warrant on a breath test. If you're doing it at the precinct, you can do it as you go there. Right now, we get dozens of consent cases of homes where the police tell the homeowner, we're applying for a warrant. And the homeowner says, then I've got to do it. And so the number of warrants are much less because of that, because they know they're going to get a warrant. So if you can put a system in place for a warrant, and you tell the person, if you don't take the warrant, you're going to, if you don't do the breath test, you're going to be charged with obstruction, what are you losing out? Well, what we're really losing out is the enhanceability. That is the difference between charging someone- What's enhanceability? For a DWI. So in both Minnesota and, well, I'm sure everywhere, there's enhanceability with DWI laws. So in Minnesota, and for example, if I can't charge the DWI or refusal, and I'm only left with an obstruction, I can no longer use that event to enhance any future DWI that same person might commit. Sorry, you changed the law. You know, it's as if you want us to create an exception to the Fourth Amendment, a very drastic one, to give someone the right to say yea or nay without a warrant. But we don't permit people to say yea or nay when a warrant is present. If they don't comply, they're charged with obstruction, and there will be consequences to obstruction. But not the same consequences that it would be if it was a DWI or a refusal. Well, that's because you choose not to penalize obstruction at a higher level. That's your choice. We're now creating an exception to the Fourth Amendment because of your choice. Well, and it's Minnesota's position that a warrant isn't necessary. I appreciate that. But I'm assuming if you can get a warrant. Justice Sotomayor is assuming that you're going to lose, so she wants to know what your reaction is to that. I don't like it. I don't like it one bit. Thank you. Thank you, Counsel. Mr. Gershengorn? Mr. Chief Justice, and may it please the Court, I'd like to do three things this morning. First, address the real-world consequences. Second, explain why I think a bright-line criminal rule is at odds with common sense, the U.S. Code, and this Court's precedent. And third, explain why it would be a mistake to have a warrant requirement. In the real world, I think it's critically important that this Court not assume that warrants are available 24-7. That is not the case in the real world. The Court knows that from the NHTSA studies that are in the record. The North Carolina example is one. What the study did there was compare three jurisdictions that were able to put in a warrant requirement against the nine jurisdictions that, for various resource reasons, availability of judges reasons, and other reasons, were unable to do it. The experience of the Park Police, I can tell you, in the wake of McNeely, is that while they can get the warrants 24-7 in Maryland, they have stopped doing blood draws except in extraordinary circumstances in Virginia and D.C. because the magistrates are not available 24-7. Even in McNeely itself, where the Court listed in a long, long footnote, Why in Maryland have they been able to and Virginia not? For the federal system, it's not a resource constraint. Some of it, as the Court recognized in McNeely, is a willingness of the judges to be available 24-7, a matter of priorities in federal court. You may not get, in the Southern District of New York, you may have 24-7 availability for terrorist attacks, but you may not have them for routine drunk driving. And so even in D.C. and Virginia, where you may have it for fatal crashes, it's not available 24-7. And how long does it take a person is drunk, he is 10 percent above the legal limit, whatever that is, how long does it take to dissipate? Do you know? I mean, how long before that would register 10 percent above is now equal to or less than? Is that a number? Have you come across any kind of study on that? So some of the statistics, I don't have the exact statistics, Your Honor. What the Court has found is there's significant dissipation, but that you can back-calculate if you get it. But there is a delay in getting the warrant at times. In the Maryland case, you can get it as soon as 15 minutes, but a warrant can take as long as 90 minutes or two hours. That's at page 37 of the study. So I think it would be a big mistake for this Court to decide the case. I was going to say in the McNeely footnote, the Court listed 33 states that have electronic warrants, which is not the same as 24-7 judicial availability, but that leaves 17 states that don't have it. And so I really think it's a mistake for the Court to decide it on that basis. But there are more and more every year, aren't there? I mean, we're now up to over 40, aren't there? So, Your Honor, there definitely are more and more every year. But, again, I think that if the Court is doing a rule based on the idea that these warrants are constant, are always available, there's a serious risk that once you require that, that then the evidence is lost, particularly in a breath test, in a jurisdiction where you can't get a warrant. So if I could then turn to the bright-line criminal rule that I understand to be the core of Petitioner's case. In McNeely, this Court said that a state may condition driving on public roads and may require as a condition that a motorist arrested or detained for drunk driving agree to a BAC testing and that the state may impose significant consequences on the subsequent refusal. So the question is, does the Constitution impose a bright-line rule against criminal penalties even when lesser sanctions are insufficient to overcome the natural incentive that many drivers will have not to abide by that condition? As a matter of common sense, I think that doesn't make sense. The idea that you can only withdraw a government benefit has major problems. For example, if the condition would extend beyond the term of the benefit, canceling the benefit does nothing. And the U.S. Code reflects that. If I could, Your Honor, I am subject under 18 U.S.C. 207 to a one-year ban when I leave the Solicitor General's office for contacting or communicating with the SGE's office on an official matter. That is punishable under 18 U.S.C. 216 by up to a year in jail. That is a criminal penalty as a condition on my employment. That is not the only situation. 18 U.S.C. 603 criminalizes contributions by government employees. 42 U.S.C. 14135 criminalizes a probationer's refusal to give DNA. The idea that there is a bright line between administrative sanctions and criminal sanctions that forces the government to rely only on withdrawal of the benefit is just not the case. That's reflected in this Court's case law. Back in 1927, in the Stevenson case, which is discussed in the brief, that was a situation in which Texas had conditioned driving on the Texas roads and restricted that by imposing all sorts of permitting requirements. Now, in that era, the Lochner era, those were viewed as unconstitutional interference with a private contract. And although the other side identifies Stevenson as a case that did not have criminal penalties and that was just withdrawal of the benefit, we read that case differently, and I think if the Court looks at page 260 of Stevenson, it will see that the Texas statute imposed criminal penalties. And so, again, the idea that the only thing the government can do is withdraw a benefit in the context of an unconstitutional condition and can't go to the core of it, which is to enforce the prohibition, really makes little sense. I think one of our concerns is that driving is so essential for so many people that it's really different than opting to work for the Solicitor General. So, Your Honor, I take that. But I think this is critical. What the Court said in McNeely, the Court crossed that bridge in McNeely and in Breithaupt and in Mackey and in Neville. Excuse me, Your Honor. And what the Court has said is for 60 years, yes, of course it's different than working the Solicitor General's office, but it's a dangerous activity when you're driving two tons of steel down the road. And the Court said you can condition driving. That is a reasonable condition that the state can impose. This is a helpful answer, and your time is running, but I'm going to stop you just to ask another question. Yes. Is it permissible, based on the pleadings and the briefs that have been filed with us, for the Court to make a distinction between taking a breath test, refusing to take a breath test, and refusing to take a blood test? Certainly it is, Your Honor, and we set forth that in our brief. I do think what this Court said in Skinner, in Your Honor's opinion in Skinner, is that a breath test is – the Court has never held, the way it did in McNeely, that a warrant is required, and it should not do so. Here, the Court said in McNeely, in Skinner, that there are no significant privacy interests, that we cannot conclude a breath test implicates significant privacy concerns. That makes good sense, because the intrusion is much smaller, the amount of information that's revealed is just the alcohol, it's a much narrower set, and it can be done as part of the regular booking process. So on that side of the scale, the privacy interests are substantially smaller. And are those tests often administered roadside? Everybody says they've been told they have to go – I thought they were roadside. So, Your Honor, as a general matter, they're actually done at the station. There's a preliminary test that can be done at the side of the road that often is not admissible in evidence. There are these so-called Batmobiles, the blood alcohol testing mobiles, that can be done at the side of the road, but many jurisdictions, including the Park Police, are not using those. They actually are done at the station. But I also would like to say, following on Your Honor's opinion, on Your Honor's question, that the warrant requirement is kind of an odd fit in the breath context, because even with a warrant, generally the warrant, of course, it provides the function of having a neutral magistrate look at the evidence. But generally with a warrant, then the officer can force compliance. That's part of what the warrant allows. That's not possible in the breath context. With this court, a warrant for a breath analysis can't be accomplished without the consent of the breather. You can't force somebody to breathe steadily enough. It's like an extended birthday cake blowout, candle blowout. You can't force somebody to do that. So the warrant is kind of an odd fit. Presumably there are sanctions for failing to comply with a valid warrant. If the police have a warrant to search your house and you say, I don't care, I'm not going to let you in, it's presumably subject to criminal sanctions as well. Your Honor, it might well be, but I just think it shows a little bit why the use of the warrant doesn't quite map on the way, I think, in a usual search context. I think the other problem that you have is because you can't force compliance, you might have another statute later to do it, but because the consequences are not as clear, what it will do is drive the state to the blood testing, which one can force. But that's the very situation that this Court recognized in Neville and that the states here have told you, I think, consistent with Neville, is a situation that states don't want to be driven to, to a forced blood draw on a non-consenting individual. But, Dan, what about that is, assuming for argument's sake, that you can take a breathalyzer without a warrant, what need is there for a blood test without a warrant? I mean, why isn't it at a minimum that if you're going to have a blood test, you need a warrant? So, Your Honor, one difference, of course, is that the blood test does, if an officer has a suspicion that there's other than alcohol at issue, the blood test is critically important. Of course, it's important, but it's going to take time. You've got to get to the hospital. There are risks involved. It's a more serious intrusion. And so the requirement, as you said, could be pretty minimal. You go to, during that 15, 20 minutes, he's going to the hospital, go get a warrant. Nobody's saying they can't do it. The question is whether they have to have a magistrate's approval. And so that's what my question was. If you need a win on the breathalyzer, why would you win on the blood test? Your Honor, we win on the blood test because there is no bright line on criminal sanctions and because it's critically important outside the blood context and where you need the drug evidence. Thank you. Thank you, counsel. Three minutes, Mr. Rothfeld. Thank you, Mr. Chief Justice. And if I may, I'll make three quick points. Two legal and one practical. First, I think, given the discussion with the Court not to lose sight of what you think is the fundamental legal proposition of what's going on in this case, which is that in North Dakota and Minnesota, people who drive on the roads are automatically, irrevocably, lose their Fourth Amendment right to resist warrantless searches. There's no consent here. There's no knowledge that's been demonstrated or been part of these defendants. So the proposition that's being offered by the government is that States can simply attach to any benefit that is provided to individuals the surrender of a constitutional right, whether or not the individuals know that they're going to do it. And in the future, a criminal penalty can be attached to the exercise of that constitutional right. That's quite a remarkable proposition. I think that the examples that Mr. Gershengorn offered of criminal penalties that can be attached to the government employees, for example, are situations in which there actually is no First Amendment right. Those are hickering cases in which there are substantial limitations on what the government employees can do. So there would be no constitutional problem there. Second, on practicalities, there have been discussion about the nature of warrants and how readily available they are. If the Court reveals the studies by the National Highway Transportation Safety Administration, which has looked at this extensively, it will find, as it addressed to some extent to McNeely, that warrants are almost universally available on quick and efficient terms. The amicus briefs that file on our side of the case demonstrate that this is true in a vast majority of cases. There are more cases, more States that provide these warrant mechanisms now than did when McNeely decided. So it's going to become a universal mechanism. As the NHTSA study shows, that in virtually all jurisdictions, including rural jurisdictions, as Justice Alito asked about, these are warrant procedures that work effectively, that the officers on the field, the magistrates and the judges who handle these warrant processes, which is going to be effective, that drives down test refusal, that makes confrontations between officers and drivers substantially reduced, and that drives up DUI convictions. And so warrants are an effective way of addressing this. And as the Court said in Riley, the answer to a situation like this is simply get the warrant. A third final point on the question of breath versus blood tests, the Court, so far as I'm aware, has never said that once there is a search that's taking place in a law enforcement investigation, that one can cut out certain character, certain types of procedures or certain types of evidence that's being sought. The presumption is that a warrant should be required. And in the Skinner case, I mean, the Court addressed both blood and breath tests, although it noted there were differences between the two. It treated them identically for forthcoming purposes. It said that they have essentially very, very similar characteristics. They involve similar personal degrees of personal inclusion. And I do not think that there is any supportable reason for treating the two differently for purposes of the warrant requirement. If there are no further questions, Your Honor. Thank you, counsel. The case is submitted.